UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JANE DOE, for herself, and ) <br> JOHN DOE a minor child, through his ) <br> parent, JANE DOE, ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> WILLIAMSON COUNTY BOARD ) <br> OF EDUCATION and PATRICK ) <br> BOYD, in his individual capacity, ) <br> ) <br> **Defendants.** ) | Case No. 3:20-cv-00486 <br> Judge Aleta A. Trauger |

## MEMORANDUM

The Williamson County Board of Education ("WCBOE") and Patrick Boyd have filed a Motion to Dismiss (Doc. No. 17), to which Jane Doe, on her own behalf and on behalf of minor child John Doe, has filed a Response (Doc. No. 22), and the WCBOE and Boyd have filed a Reply (Doc. No. 23). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND[1]

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). Tennessee has participated in the IDEA or its similar predecessor program for several decades. *See, e.g., Clevenger v. Oak Ridge Sch. Bd.*, 573 F. Supp. 349, 349

---

[1] Except where otherwise indicated, the facts set forth are taken from the Does' First Amended Complaint (Doc. No. 15) and are accepted as true for the purposes of the Motion to Dismiss.

(E.D. Tenn. 1983) (applying Act's predecessor in Tennessee), *rev'd on other grounds*, 744 F.2d 514 (6th Cir. 1984).

"[T]he IDEA gives the 'primary responsibility . . . for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)). At the heart of this collaborative process is the child's individualized education program, or "IEP." "The IDEA establishes procedures by which school officials, parents, and the student can collaborate to create an IEP" that takes into account the unique needs of the child, the special education expertise of the educators, and the voice of the child's parents or guardians as advocates for the child's best interests and educational needs. *Id.* at 432 (citing 20 U.S.C. §§ 1401(11), 1414(d); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985)).

In the event that those parties disagree, however, the state is required to provide an administrative due process hearing for a challenge to any matter relating to a student's receipt of a FAPE, including the student's educational placement. 20 U.S.C. § 1415(b)(6), (f)–(g), (k). While the IDEA provides for a private right of action for these matters as well, it requires that plaintiffs first exhaust the administrative procedures. 20 U.S.C. § 1415(i)(2); *see also S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008).

John Doe is a middle school student in the Williamson County school system. He is disabled due to symptoms associated with "a number of anxiety-related disorders including obsessive compulsive disorder, depression, generalized anxiety, attention-deficit/hyperactivity disorder (ADHD), and motor tic disorder." (Doc. No. 15 ¶ 6.) Those symptoms "substantially

2

impair his major life activities of concentrating, thinking, communicating, learning, processing thoughts, interacting with others, and transitioning" to new situations. (*Id.*)

Tennessee public school students are mostly assigned to a school within their district based on the location of the student's residence. During the 2017–18 school year, John attended fifth grade at the school for which he was zoned, Crockett Elementary School. When John was at Crockett, he made important friendships with his peers that helped him to thrive despite the obstacles created by his impairments. Instruction at Crockett Elementary terminates after fifth grade, after which its students are zoned to attend Woodland Middle School. Before John began his sixth grade year, however, he and his mother moved to a new home on Williamson County's Split Log Road. Prior to that school year, the Split Log Road home, like the Does' previous home, was zoned for Woodland Middle. In August 2018, however, the WCBOE amended its zoning plan to zone the Split Log Road home for a different middle school. Complicating matters further, the WCBOE failed to enter the accurate, revised zoning information into the software that it uses to assign students to schools. John, therefore, was assigned to and attended Woodland Middle for the 2018–19 school year, despite the fact that it was not, in fact, the school for which his home was zoned. (*Id.* ¶¶ 8–10.)

In 2019, the Does began planning to move again—this time, because Jane Doe had become engaged and intended to move, with her son, into the home of her future spouse on North Chapel Road. Unlike with their previous move, Jane was aware that the new home would not be zoned for Woodland Middle and that, therefore, the move would mean that John would no longer be zoned to attend the same school as the friends he had made from Crockett Elementary. Jane worried that John's separation from his friends would not only cause him great anguish but interfere with his education, because his friendships had provided a beneficial and stabilizing effect on his school

3

life. She, therefore, hoped that he would be able to continue attending Woodland Middle. (*Id.* ¶¶ 12–13.)

Williamson County students who wish to attend a school other than the one for which they are zoned may file an out-of-zone request pursuant to WCBOE Policy 1.703. For a non-disabled student, an out-of-zone request will not be approved unless three requirements are met: (1) the school that the student wishes to attend must by classified by the WCBOE as "open zoned"; (2) the principal of the school for which the student is zoned must sign an acknowledgment that he received notice of the request; and (3) the WCBOE superintendent and the principal of the school that the student wishes to attend must both approve the exception. (*Id.* ¶¶ 14–15.) Policy 1.703, however, also provides that a student may attend an out-of-zone school, without satisfying the above criteria, if the student is disabled and the out-of-zone placement is recommended by his IEP. (*Id.* ¶ 16.) Finally, Policy 1.703 includes a general safety-valve provision, allowing an exception to the policy's requirements based on the "specific curricular and/or documented needs" of the student. Final decisions under Policy 1.703 are made by the WCBOE's Zoning Appeals Committee. (*Id.* ¶ 17.)

Jane Doe submitted an out-of-zone request on behalf of John Doe in April of 2019. (*Id.* ¶ 19.) Woodland Middle was, at least at the time of the request, open-zoned, meaning that the request satisfied the first of the three criteria necessary for approval outside the context of the IEP process or the safety-valve provision. (*Id.* ¶ 20.) Around April 24, 2019, however, a WCBOE Specialist of Planning and Zoning informed Jane by telephone than John's request was being denied. (*Id.* ¶ 21.) The Does have been told that Woodland Middle's principal, Patrick Boyd, reviewed and denied the request himself. Assuming that that account is accurate, then John was ineligible for an out-of-

4

zone exception through the primary, three-requirement route, because he did not satisfy the final requirement. (*Id.* ¶ 23.)

The Does have also sought to have an IEP put into place related to John's disabilities. The timing of this process is not clear from the First Amended Complaint, but the request for an IEP was eventually denied. Without an IEP—or an IEP team—John was not eligible for the first way to bypass the ordinary requirements of Policy 1.703, through a request by the IEP team. (*Id.* ¶ 26) The only option available to him, therefore, was through the general safety-valve exception based on "curricular and/or documented needs." The WCBOE, however, did not grant John an exception to Policy 1.703 under that provision either. (*Id.* ¶ 31)

Jane appealed the denial of an out-of-zone exception, and the appeal was denied. (*Id.* ¶ 26) Concurrently, she appealed the denial of an IEP through the IDEA's administrative process. That administrative process was still ongoing when this case began, and the parties have not indicated to the court that it has been concluded. (*Id.* at 7 n.3.) If John is successful in his IDEA appeal, he will be granted an IEP that will bring him into the broad structure of the IDEA. Within that structure, the IEP team will make determinations about a wide range of issues relevant to his receipt of a FAPE—including, specifically, the educational setting in which he will be instructed. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV)–(VII). Policy 1.703, by the Does' own admission (and by the edicts of the IDEA), would require WCBOE to honor his IEP placement. (Doc. No. 15 ¶ 16.)

In the meantime, however, Jane had no way to keep John at Woodland Middle as long as she lived outside the school's zone. In order to maintain his placement, therefore, she leased an "additional home" within the Woodland Middle zone, for a price of $3,650 per month. John stayed at the rental property "the majority of nights" and, as a result, was permitted to attend Woodland Middle as an in-zone student. (*Id.* ¶ 45.) As of the time of the First Amended Complaint, renting

5

the home had cost Jane Doe "$79,500 to date, . . . increasing monthly." (*Id.* ¶ 46.) Prior to the 2020–21 school year, she again requested an out-of-zone exception. This time, however, the exception was granted. Jane Doe, however, expresses concern that the exception may be rescinded in coming years. (*Id.* ¶ 47.)

On June 11, 2020, the Does filed a Complaint in this court against the WCBOE and Boyd, in his individual capacity, based on their handling of John's assignment within the district. (Doc. No. 1.) On July 29, 2020, they filed their First Amended Complaint. (Doc. No. 15.) They plead three counts, two against the WCBOE and one against Boyd. Count I is a claim against the WCBOE under 42 U.S.C. §1983, based on the WCBOE's alleged violation of John's Fourteenth Amendment right not to be deprived of a property interest without due process. (*Id.* ¶¶ 48–53.) Count II is a claim against Boyd under 42 U.S.C. §1983, based on Boyd's alleged deprivation of John's rights under the Equal Protection Clause. (*Id.* ¶¶ 54–58.) Count III is a claim against the WCBOE under Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, "alone or in conjunction with Section 1983." (*Id.* ¶¶ 59–58.)

Rule 8(a)(3) of the Federal Rules of Civil Procedure requires every civil complaint filed in this court to include "a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3). In most non-*pro se* civil cases that this court considers, that requirement is fulfilled in a brief, separate section near the end of the complaint, expressly designated as a prayer or demand for relief. Counsel for the Does has chosen instead to embed the Does' demands for relief in the body of the First Amended Complaint as a whole. Jane Doe seeks "reimbursement of" the funds she spent on the of $3,650 monthly rent for her in-zone

6

home "as damages." (*Id.* ¶ 46.) John Doe "seeks injunctive relief to continue the zoning exemption going forward, as [he] is able." (*Id.* ¶ 47.) The Does also seek attorney's fees. (*Id.* ¶¶ 53, 58, 61.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).[2] "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

---

[2] The plaintiffs suggest that, "[w]hen not faced with terrorist attacks on the United States like [in] *Iqbal*, the Supreme Court is more lenient on pleadings." (Doc. No. 22 at 11.) The Federal Rules of Civil Procedure, which *Iqbal* construed, "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1.

7

## III. ANALYSIS

### A. The IDEA Exhaustion Requirement and IDEA-Adjacent Federal Claims

The defendants argue, first, that the plaintiffs' claims should be dismissed because, when the plaintiffs filed their Complaint, they had not yet completed the IDEA administrative process.[3] Although the Does apparently do believe that the WCBOE violated the IDEA in John's case, they have not filed a claim under the IDEA as part of this litigation. That does not, however, necessarily resolve the question of whether his claims are subject to dismissal based on a failure to exhaust the IDEA process. Section 1415(l) of the IDEA addresses the relationship between the Act's procedures and other, potentially overlapping causes of action that might arise out of a school's mishandling of a student's special education needs:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l). While the ADA and the Rehabilitation Act are the only statutes expressly mentioned in § 1415(l), the provision, by its own terms, applies to all federal causes of action, including those regarding rights "available under the Constitution." The Sixth Circuit, consistently with that language, has held that § 1983 claims may be subject to the § 1415(l) bar. *See F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 643 (6th Cir. 2014) ("Appellants are not excused from exhaustion merely because they request compensatory damages under § 1983."); *Griffin v. Sanders*, No. 11-CV-12289, 2013 WL 3788826, at *15 (E.D. Mich. July 19, 2013) (holding that §

---

[3] Although there was apparently an administrative hearing scheduled for October (*see* Doc. No. 22 at 2), no party has updated the court regarding the outcome, if any so far, of that hearing.

1983 claims are barred "because of Plaintiff's failure to exhaust administrative remedies under the IDEA"); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) ("This provision bars plaintiffs from circumventing the IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute—e.g., section 1983, section 504 of the Rehabilitation Act, or the ADA.") (quoting *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 281 (3d Cir. 1996)). Each of the plaintiffs' claims, therefore, is subject to the exhaustion requirement, if the plaintiffs "seek[] relief that is also available under" the IDEA. 20 U.S.C. § 1415(l).

Courts, including those in this circuit, have sometimes struggled to determine what it means for a claim to "seek[] relief that is also available under" the IDEA. The IDEA takes a "flexible approach" to remedies, *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007), allowing a court to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). There is, in other words, a relatively open-ended range of remedies that could be "available under" the Act. That flexibility in the remedy's means, however, is accompanied by a tight restriction on the remedy's ends. "[T]he only relief that an IDEA officer can give . . . is relief for the denial of a FAPE," and the Supreme Court has extended that limitation to the relief that a court can provide for an IDEA claim. *Fry*, 137 S. Ct. at 753. As a result, types of damages that do not directly address the denial of the student's FAPE—including some types of remuneration that would be covered by general money damages—fall outside the FAPE framework and, accordingly, are not recoverable under the IDEA. *See Somberg ex rel. Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 177 (6th Cir. 2018) ("[T[his court has interpreted Supreme Court precedent to hold that money damages are not available to remedy violations of the IDEA.") (citing *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386 (6th Cir. 1992)). As relevant

9

to this case, the Does point to the damages that they seek related to their lease of an in-zone house while John was denied an out-of-zone exception. Such damages, they contend, are unavailable under the IDEA, meaning that they do not seek relief "available under" the Act.

The court's consideration of this issue is guided by the Supreme Court's recent decision in *Fry v. Napoleon Community Schools*, which construed the § 1415(l) exhaustion requirement. In that case, the plaintiff, a disabled child with cerebral palsy, had sought but been denied permission to have her service dog accompany her in the classroom. 137 S. Ct. at 751. She and her parents sued the "local and regional school districts in which [her elementary school was] located, along with the school's principal" under the ADA and Section 504. *Fry*, 137 S. Ct. at 751–52. They sought declaratory relief and money damages. *Id.* at 752. The district court dismissed the claims for failure to exhaust, and the Sixth Circuit affirmed, applying the rule that exhaustion was required whenever "'the genesis and the manifestations' of the complained-of harms were 'educational' in nature." *Id.* at 752 (quoting *Fry v. Napoleon Cmty. Sch.*, 788 F.3d 622, 627 (6th Cir. 2015)). The Supreme Court vacated the Sixth Circuit's decision and repudiated the Sixth Circuit's approach as overly broad. Instead, the Supreme Court announced two principles for guiding the determination of whether to require exhaustion under § 1415(l):

> We first hold that to meet [the § 1415(l)] statutory standard, a suit must seek relief for the denial of a FAPE, because that is the only "relief" the IDEA makes "available." We next conclude that in determining whether a suit indeed "seeks" relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint.

*Id.* at 752. Under *Fry*, "[w]hat matters is the crux . . . of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.* at 755.

*Fry* is, by its own terms, not necessarily determinative of this case. The Court, in *Fry*, stressed that it was "leav[ing] for another day a further question about the meaning of § 1415(l):

10

Is exhaustion required when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests—here, money damages for emotional distress—is not one that an IDEA hearing officer may award?" *Id.* at 752 n.4. The plaintiffs in *Fry* had, in fact, sought such damages, along with declaratory relief that would more closely mirror what an award would have looked like under the IDEA. *Id.* at 752. The Court, however, did not consider the effect of that factor on the § 1415(l) analysis, on the ground that "resolution of that question might not be needed in this case because the Frys also say that their complaint is not about the denial of a FAPE." *Id.* at 752 n.4. This court, accordingly, will structure its analysis in the same manner as the Supreme Court's in *Fry*: by considering, first, whether the gravamen inquiry is sufficient to relieve the plaintiffs of the exhaustion requirement and then considering, only if necessary, whether the specific nature of the relief that they have sought offers them an alternative way forward.

**B. Gravamen of the Case**

The Supreme Court characterized the respective gravamens of the IDEA and the federal antidiscrimination statutes with which it often overlaps as follows: "the IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." *Id.* at 156. In and of itself, that formulation does not necessarily provide much guidance regarding how to classify any particular case, as many situations—indeed probably most situations in which *Fry* would even come up—can be characterized in either way. That is certainly the case here: the Does allege that John was denied both individually tailored educational services and non-discriminatory access to a public institution.

In light of this difficulty, the Supreme Court offered some additional tools that might assist a court in making its determination:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come

11

> from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.* at 756. In a concurrence, however, Justice Alito expressed skepticism that the questions suggested by the Court would prove particularly effective at separating cases that have a gravamen in the IDEA from those that do not. *Fry*, 137 S. Ct. at 759 (Alito, J., concurring); *see also Sophie G. ex rel. Kelly G. v. Wilson Cty. Sch.*, 742 F. App'x 73, 79 (6th Cir. 2018) (noting that "*Fry*'s clues will not always assist courts"). Acknowledging the roots of Justice Alito's skepticism, Justice Kagan, writing for the Court, conceded that the questions were chiefly intended to be helpful in a hypothetical case in which the plaintiff "has chosen to bring a claim under Title II or § 504 instead of the IDEA—and whose complaint makes no mention of a FAPE." *Fry*, 137 S. Ct. at 757 n.10.

The *Fry* questions provide some guidance in this case, but, as Justice Alito warned, they are somewhat indeterminate in their own right. Specifically, where the questions lead depends on how one defines John Doe's deprivation. Was he deprived of the opportunity to be educated alongside his friends? If so, that violation seems specific to schools. Friendship and peer interaction are a big part of middle school; they need not be a big part of, for example, renewing one's driver's license or checking out a book from the library. Th question phrased in that manner, therefore, would suggest that the gravamen is the denial of his FAPE. But would it be better, in the alternative, to say that John Doe was deprived of the opportunity to receive services in the specific facility, among a choice of various otherwise adequate facilities, that would be least

12

disruptive to his mental health? That type of discrimination seemingly could occur with regard to any service and any person with relevant mental health symptoms. In other words, while the questions suggested in *Fry* are somewhat clarifying, they also unfortunately tend to return the court to a place where the gravamen is in the eye of the beholder.

The Supreme Court also suggested in *Fry* that "[a] further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream." *Fry*, 137 S. Ct. at 757. Although the Does do not appear to have "switched midstream"—they are still pursuing the IDEA process—their IDEA appeal would seem to be consistent with finding a gravamen under the IDEA That clue, as well, though, would not necessarily be conclusive. A plaintiff might pursue the IDEA process by mistake, or he might pursue it prophylactically—just in case the courts end up requiring his exhaustion of the process—precisely *because* the Supreme Court's test is so unpredictable. The court, therefore, will not treat the Does' pursuit of remedies under the IDEA as determinative—although it is another piece of information pointing in the direction of requiring exhaustion.

The best way to resolve this issue that the court is aware of is simply to read a plaintiff's complaint closely, in the context of the statutes invoked and not invoked, to determine what the "crux" of the case is. Even the question of how to do that, however, can be a complicated one. On one hand, *Fry* treats the plaintiff "as 'the master of the claim': She identifies its remedial basis—and is subject to exhaustion or not based on that choice." *Id.* at 755 (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 & n.7 (1987)). On the other hand, the court, in evaluating the complaint, must "consider substance, not surface." *Id.* at 755. *Fry*, therefore, asks a district court

13

to walk a tightrope; when it comes to the substance of the complaint, the court must defer to the plaintiff's decisions to structure her claims in the particular way of her choosing, implicating or not implicating the exhaustion bar based on what she has decided to plead. At the same time, however, the court must be careful not to defer improperly to the plaintiff's purely stylistic, rhetorical, or nomenclatural choices, which might be crafted specifically in an attempt to evade the exhaustion requirement or might simply reflect a misunderstanding of how deeply the IDEA is implicated by the claims at issue.

With that in mind, what should the court look for? The Supreme Court stressed in *Fry* that "asking whether the gravamen of [a student's] complaint charges, and seeks relief for, the denial of a FAPE" is different from merely asking whether the student's complaint is "broadly speaking, 'educational' in nature." *Id.* at 758. Nevertheless, the role and prominence of educational concerns and objectives in the plaintiff's complaint and request for damages are important considerations. It is relevant, for example, whether the plaintiff "mak[es] . . . reference to the adequacy of the special education services" provided by the school and/or "accuse[s] the school . . . of refusing to provide the educational instruction and services that [the student] needs." *Id.* at 758. The court should also consider whether the substance of the allegations suggests a "focus on the adequacy of [the student's] education," even if that focus is "implicit." *Id.*

Although the court has concerns about the workability of *Fry*'s gravamen analysis in close cases, a thorough reading of the First Amended Complaint confirms that, in this instance, the gravamen of the Does' claims is clearly the denial of a FAPE. The Does argue that John's placement at Woodland Middle "was necessary for him to . . . *learn* because his difficulty with transitioning to an environment with totally different peers was feared to be too difficult mentally." (Doc. No. 15 ¶ 25.) They argue that WCBOE "exclude[ed] him from the educational process and

14

the opportunity to learn." (*Id.*) Count I is premised on John's "property interest in public education," which the WCBOE allegedly denied in light of his "demonstrated need to remain [at Woodland Middle] in order to learn and avoid risk of mental injury." (*Id.* ¶ 48.) Although Counts II and III are framed in the language of discrimination, the substance of the allegations is the same: John Doe was not able to obtain an adequate education at any WCBOE school other than Woodland Middle, and, by removing him from the school, the WCBOE would have denied him his education.

What the Does allege is a textbook denial of a FAPE—and not incidentally so. *See L.G. ex rel. G.G. v. Bd. of Educ. of Fayette Cty., Ky.*, 775 F. App'x 227, 231 (6th Cir. 2019) (finding that the gravamen of the plaintiff's claim was denial of a FAPE because, "[a]t the heart of [the plaintiff's] claim is an allegation that the Board of Education did not provide him with the individually-tailored educational support he needed in order to continue his academic studies"). Questions of educational placement are core concerns under the IDEA. Indeed, finding a placement that maximizes a disabled student's beneficial socialization among non-disabled peers is an issue both prioritized by the Act itself and raised frequently in IDEA litigation. *See* 20 U.S.C. § 1412(a)(5)(A) (requiring education in least restrictive environment); *see, e.g.*, L.H. v. Hamilton Cty. Dep't of Educ., 900 F.3d 779, 788 (6th Cir. 2018). This is not a case of discrimination that just so happened to take place in the schools. The Does' allegations are that, because of the unique *educational* obstacles posed by John Doe's disability, he needs to be at Woodland Middle in order *to learn*. That is, at its heart, an IDEA case. The court therefore holds that the gravamen of his claim is the denial of a FAPE and, therefore, that *Fry* does not excuse his claims from the IDEA exhaustion requirement.

15

## C. Type of Relief Sought

The court therefore turns to the issue that *Fry* explicitly did not resolve—whether a plaintiff's non-IDEA claims can be excused from the IDEA exhaustion requirement because the plaintiff seeks relief that the IDEA categorically would not provide. The rent that Jane Doe paid for her in-zone home represents, at most, consequential or mitigation damages of the WCBOE's actions, and the parties appear to agree that those damages could not be awarded under the IDEA. On the other hand, however, the First Amended Complaint does specifically request potential injunctive relief that plainly would be available under the IDEA—a permanent exception to the WCBOE's geographic zoning scheme. The Does have not emphasized that aspect of their claims, nor is the request featured prominently in the First Amended Complaint. The request, though, *is* there, and the Does have confirmed, in their briefing, that they continue to seek injunctive relief in this court.

The plain language of § 1415(l) requires exhaustion prior to filing any "civil action under [federal] laws seeking relief that is also available under" the IDEA. Two aspects of that language are particularly relevant here. First, § 1415(l) governs the filing of the "civil action," not merely a request for a particular type of relief. Congress could have drafted the subsection to require a court only to deny relief also available under the IDEA if there was no exhaustion. Under such a law, the court would dismiss any prayers for relief that overlap with IDEA remedies but otherwise continue to consider the case. Congress, instead, applied this bar to the "action." That language strongly suggests that § 1415(l) envisions that a court has a duty to consider all of the relief sought, rather than merely to trim away extraneous requests that overlap with the IDEA.

Second, and perhaps itself wholly determinative in this case, § 1415(l) does not actually say anything whatsoever about requesting relief that is *not* available under the IDEA. To the

16

contrary, whether the exhaustion bar applies is based on whether the plaintiff requests relief that *is* available under the IDEA. The plaintiffs in this case have done so, even if it is not the relief they appear more focused on. Nothing about requesting one form of relief that is *un*available under the IDEA negates a request for another form of relief that is available. The Sixth Circuit has recognized as much, expressly holding that plaintiffs "are not excused from exhaustion merely because they request compensatory damages under" some statute other than the IDEA. *F.H.*, 764 F.3d at 643. The court therefore holds, based on the plain language of § 1415(l) and the caselaw of this circuit, that, where a plaintiff files a federal lawsuit, the gravamen of which is denial of a FAPE and in which he seeks any relief available under the IDEA, his action should be dismissed, regardless of whether he also seeks relief that is unavailable under the IDEA.[4]

Such a holding is consistent with the purposes of the IDEA exhaustion requirement. The Sixth Circuit has held that the rationale behind requiring exhaustion is that "[t]he federal courts are not the entities best equipped to craft an IEP or remedial substitutes. They are, instead, suited to reviewing detailed administrative records, such as those that would be furnished through due process hearings . . . under the IDEA." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006); *see also L.G..*, 775 F. App'x at 230 (noting that the exhaustion requirement exists to further "the interest of judicial economy and to take advantage of agency expertise"). If this court were to consider a claim for injunctive relief based on a claim that is fundamentally about the denial of a FAPE, the court would unavoidably be intruding upon the process that the IDEA has intentionally committed, at least in the first instance, to the skilled educational professionals who deal most directly with the child.

---

[4] The court does not rule out the possibility that a case could exist in which some of the plaintiff's claims were sufficiently unrelated to the claims subject to exhaustion that those claims could be severed and only the exhaustible claims dismissed. In this case, however, all of the claims are closely tied together and all share the same gravamen.

Requiring exhaustion here is also consistent with the history of the IDEA. Section 1415(l) was not enacted in a vacuum, but rather to strike a balance in the face of a particular problem. In 1984, the Supreme Court held, in *Smith v. Robinson*, 468 U.S. 992 (1984), that the IDEA's predecessor statute was "the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education" and, by extension, any other overlapping federal claims. *Id.* at 1009. The plaintiff had brought an equal protection claim under § 1983, on the ground that his home state had deprived him of his federal constitutional right to equal protection under color of law in the state's administration of his special education. The Court, however, held that, "[i]n light of the comprehensive nature of the procedures and guarantees set out in the" IDEA's predecessor statute, Congress had implicitly foreclosed a child or his parents from pursuing overlapping special education-related claims via other federal statutes. *Id.* at 1011. Congress responded to *Smith* by enacting the Handicapped Children's Protection Act of 1986, 100 Stat. 796, which included the exhaustion language currently found in § 1415(l). The historical context of § 1415(l), in other words, suggests an intent to preserve plaintiffs' rights under other statutes without disturbing the comprehensive procedural scheme embodied in the IDEA. Requiring exhaustion for a case so intimately entwined with an alleged IDEA violation is consistent with that balance.

The court accordingly will dismiss the Does' claims, without prejudice to their refiling them when their avenues for redress under the IDEA have been fully exhausted. The court understands that, any time the course of a child's education is involved, time is of the essence. Ultimately, though, that is just another reason why the IDEA's statutory system favors efforts to solve conflicts collaboratively and quickly before submitting to the slow pace of the courts. Once

18

that state-level administrative process is completed, the Does may, if they desire, seek relief that was not available at the administrative level in this court.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 17) will be granted, and the plaintiffs' claims will be dismissed without prejudice.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge